1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL SPAFFORD, JR.,

               Plaintiff,

    v.

ECHOSTAR COMMUNICATIONS
CORP., et al.,

               Defendants.

CASE NO. C06-479JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendants' motion to dismiss (Dkt. # 5). The court has considered the papers filed in support and in opposition to this motion and has heard oral argument.  For the reasons stated below, the court DENIES Defendants' motion.

## II.  BACKGROUND

In 1986, the Washington Legislature made it much more difficult for commercial telephone solicitors to interrupt people at home and at work.  It did so by enacting a law that severely restricts the use of automatic dialing and announcing devices ("ADADs"), which greet recipients (or their answering machines) with a prerecorded message.  RCW § 80.36.400 (the "ADAD statute").  Violation of the ADAD statute is a per se violation of

ORDER – 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Washington's Consumer Protection Act and entitles the recipient of such a call to statutory damages in the amount of five hundred dollars.  Id.

Plaintiff Michael Spafford filed suit alleging that Defendants Echostar Communications Corporation and Echostar DBS Corporation (collectively, "Echostar") contacted him and other Washington residents via ADADs in order to advertise satellite television services.  Echostar now moves to dismiss Spafford's claim pursuant to Fed. R. Civ. P. Rule 12(b)(6) ("Rule 12 (b)(6)") on grounds that the ADAD statute is an unconstitutional infringement of its First Amendment right to free speech.[1]  Because Echostar's motion raises a constitutional challenge to a state statute, the court previously granted the State of Washington ("the State") the right to intervene (Dkt. # 27).

### III.   DISCUSSION

#### A.     Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the non-moving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-8 (9th Cir. 1996).  The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  Wyler Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998).  Dismissal for failure to state a claim should not be granted "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Id. (internal quotations and citations omitted).

---

[1]The First Amendment provides, in part: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." U.S. CONST. AMEND. I.  The Due Process Clause of the Fourteenth Amendment makes this prohibition applicable to state action. See, e.g., Stromberg v. California, 283 U.S. 359, 368 (1931).

ORDER – 2

**B.     Washington's ADAD Statute**

The ADAD statute reads in its entirety:

(1) As used in this section:

> (a) An automatic dialing and announcing device is a device which automatically dials telephone numbers and plays a recorded message once a connection is made.
> (b) Commercial solicitation means the unsolicited initiation of a telephone conversation for the purpose of encouraging a person to purchase property, goods, or services.

(2) No person may use an automatic dialing and announcing device for purposes of commercial solicitation. This section applies to all commercial solicitation intended to be received by telephone customers within the state.

(3) A violation of this section is a violation of chapter 19.86 RCW. It shall be presumed that damages to the recipient of commercial solicitations made using an automatic dialing and announcing device are five hundred dollars.

(4) Nothing in this section shall be construed to prevent the Washington utilities and transportation commission from adopting additional rules regulating automatic dialing and announcing devices.

RCW § 80.36.400. The Legislature found that use of ADADs for commercial purposes:

"(1) deprives consumers of the opportunity to immediately question a seller about the

veracity of their claims; (2) subjects consumers to unwarranted invasions of their privacy;

and (3) encourages inefficient and potentially harmful use of the telephone network."

1986 Wash. Laws, ch. 281 § 2.

**C.     Level of Scrutiny**

It is well settled that "the government may impose reasonable restrictions on the

time, place, or manner of protected speech, provided the restrictions are justified without

reference to the content of the regulated speech." Ward v. Rock Against Racism, 491

U.S. 781, 791 (1989). Conversely, "when regulation is based on the content of speech,

governmental action must be scrutinized more carefully to ensure that communication has

not been prohibited merely because public officials disapprove the speaker's views."

Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 536 (1980) (internal

ORDER – 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

quotation omitted).  The court's determination of whether a statute is content-based does not, however, turn on whether the government has expressed animus toward a particular message; rather, the court looks to the "commonsense" implication of the law on protected speech.  City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993) ("Regardless of the mens rea of the city, it has enacted a sweeping ban on the use of newsracks that distribute "commercial handbills," but not "newspapers.")

Not surprisingly, the parties strongly dispute the appropriate level of scrutiny that this court should apply to Washington's ADAD statute.  Spafford and the State argue that the statute is subject to less scrutiny because it is a content-neutral time, place and manner restriction on a particular type of technology, not on any particular message. Echostar argues that the law is content-based because it singles out commercial as opposed to non-commercial speech.

The court concludes that Washington's ADAD statute is content-based, and thus, subject to the test announced in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 570-71 (1980).  The legislation expressly prohibits ADADs when such devices are used for the "purpose of encouraging a person to purchase property, goods, or services."  RCW § 80.36.400(1)(b).  As apparent on its face, the statute does not proscribe ADADs used for non-commercial purposes, such as charitable solicitations, emergency announcements, and political campaigning.  Thus, at its core, the statute differentiates between messages that contain a sales pitch and those that do not.

The court's conclusion that such legislation is content-based and subject to the Central Hudson test finds support in other decisions that have considered ADAD statutes. For example, the Ninth Circuit in Moser v. F.C.C., expressly noted that the federal telemarketing statute was content-neutral because it did *not* discriminate between commercial and non-commercial speech.  46 F.3d 970, 973 (9th Cir. 1995) ("Because nothing in the statute requires the Commission to distinguish between commercial and noncommercial speech, we conclude that the statute should be analyzed as a content-

ORDER – 4

neutral time, place, and manner restriction."). By making such a distinction, the Moser court indicated the corollary: i.e., that it would likely consider a statute that singled out commercial solicitation as content-based.

One year later, the Ninth Circuit had occasion to confirm this notion in Bland v. Fessler, when it considered California's ADAD statute. 88 F.3d 729, 731 (9th Cir. 1996). There, the court considered two sets of regulations, one of which (as here) applied exclusively to "transactions intended to result . . . in the sale or lease of goods or services . . . ." Id. at 738 - 39 (citing Cal. Civ. Code § 1770). As a result, the Bland court considered the ADAD regulation under the Central Hudson test. Id. at 738-39. Other jurisdictions – with varying outcomes – have likewise applied the Central Hudson test where the statute in question banned ADAD use for commercial purposes, while allowing their use for non-commercial messages. See Humphrey v. Casino Marketing Group, Inc., 491 N.W.2d 882, 887 (Minn. 1992) (upholding Minnesota ADAD statute); Lysaght v. New Jersey, 837 F. Supp. 646, 649 (D.N.J. 1993) (enjoining application of New Jersey ADAD statute).

**D.     Applying the Central Hudson Test to Washington's ADAD Statute**

Content-based restrictions on commercial speech must satisfy the four-part test announced in Central Hudson:

(1)     the speech concerns lawful activity that is not misleading;

(2)     the government interest is substantial;

(3)     the regulation directly advances that interest; and

(4)     the regulation is not more extensive than necessary

447 U.S. 557, 567 (1980). Here, the parties concede that the first element is not at issue for purposes of this motion[2]; therefore, the court turns to the remaining Central Hudson factors.

---

[2]The parties assume for the purposes of this motion that the content is lawful and not misleading; however Spafford reserves the right, with additional discovery, to argue otherwise.
ORDER – 5

1

### 1.    The State's Interests

2    The State expressed three primary interests in enacting the legislation, summarized

3    as (1) consumer protection, (2) privacy, and (3) keeping phone lines clear.  The court

4    concludes that the State of Washington has a significant interest, at a minimum, in

5    protecting privacy in the home and at work.  Such an interest is firmly established in the

6    caselaw and a routine justification behind other, similar ADAD statutes.  See Bland 88

7    F.3d at 731, 734-35 (summarizing caselaw and Congressional findings discussing

8    invasive nature of ADADs).  Because the court considers the State's interest in

9    safeguarding privacy a significant one, the court need not address the State's other

10    rationales.  Id. at 734 n.8 (noting that the government need only identify one substantial

11    interest).  The court now turns to the closer question of whether the ADAD statute bears a

12    reasonable relationship to the State's interest in protecting privacy.

13

### 2.    A Reasonable Fit

14    The Supreme Court has effectively collapsed the remaining two elements into a

15    single inquiry of whether the State has shown a "reasonable fit" between the ends and the

16    means chosen.  Discovery Network, 507 U.S. at 430-31.  Although the fit need not be

17    perfect, it must be *reasonable*.  Id. at 416 n. 12 (citations omitted).  The State bears the

18    burden to establish a reasonable fit between the ends (privacy) and the means chosen (the

19    selective ADAD prohibition).  Id. at 416.

20    The court begins by addressing Echostar's primary reliance on Discovery Network

21    in support of its argument that the State has failed to establish a reasonable fit between its

22    interest in privacy and the ADAD statute.  In Discovery Network, the Court considered a

23    city ordinance that prohibited commercial handbills from news racks, while allowing

24    ordinary newspapers.  Id. at 413-14 n. 2.  The City of Cincinnati's purported interest was

25    limiting sidewalk debris, although the ban impacted only 62 racks, while leaving some

26    2000 racks standing.  Id. at 417-18.  The Court held that the City failed to established a

27    reasonable fit between the regulation and the stated objective, in part, because it targeted

28

ORDER – 6

only a small source of the potential waste. Id. at 429-31. Perhaps most importantly, the City of Cincinnati's justification for singling out commercial papers was premised on nothing more than a "naked assertion that commercial speech has 'low value'" Id. at 429.

Echostar argues that Washington's ADAD statute fails because non-commercial ADAD calls will continue to invade privacy, just as the newspapers in Discovery Network continued to litter the streets. Despite its superficial appeal, Echostar's analogy ultimately fails. First, the Legislature heard testimony that commercial ADAD calls were more frequent than non-commercial calls. Smith Decl. at 11 (transcription of Wash. Sen. Energy and Utilities Comm., February 19, 1986 Hearing on H.B. 134) ("[ADAD use by charitable organizations] is much less common . . . because of the expense involved in purchasing an ADAD machine."). Predictably, the complaint statistics reflect that commercial ADAD calls (as opposed to political or charitable calls) are more invasive. Smith Decl. at 31 (Final Report, Telephone Solicitation Study for Wash. Energy and Utilities Comm.). Also not surprisingly, the majority of states have enacted legislation restricting ADAD use in order to protect privacy. Bland, 88 F.3d at 731 (noting that 40 states have passed ADAD laws). By contrast, in Discovery Network, the City singled out commercial handbills based on nothing more than what it perceived as a lesser speech value. Here, the State's decision to single out use of ADADs for commercial use, as the greater threat to privacy, bears a direct relationship to its stated interest.

That the public will continue to receive non-commercial ADAD messages does not mean that the State has failed to establish a reasonable fit. See, e.g., Destination Ventures, Ltd. v. FCC, 46 F.3d 54, 56 (9th Cir. 1995) (upholding statute that banned unsolicited faxes containing advertisements, while allowing unsolicited political or prank faxes). That is, the government is not required to legislate in such a way as to wholly eliminate a particular problem; rather, it may advance its goals in piecemeal fashion. Id. (citing United States v. Edge Broad Co., 509 U.S. 418, 434 (1993)). Accordingly, the

ORDER – 7

1   court concludes that the State has met its burden to show that its decision to target

2   commercial ADAD calls bears a reasonable relationship to protecting privacy.

3                              **IV.    CONCLUSION**

4          For the reasons stated above, the court DENIES Defendant's motion to dismiss

5   (Dkt. # 5).

6          Dated this 1st day of September, 2006.

7

8

9

10                                 JAMES L. ROBART
                                   United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER – 8